UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| R. PEACHER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-03696-JRS-DLP |
| | ) | |
| DESHAUN ZATECKY Warden, | ) | |
| DENNIS REAGLE Deputy Warden, | ) | |
| AARON SMITH Executive Assistant, | ) | |
| YOLANDA CHAMBERS, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT
AND DIRECTING ENTRY OF FINAL JUDGMENT**

For the reasons explained in this Entry, the plaintiff's motion for summary judgment, dkt. [39], is **denied** and the defendants' cross-motion for summary judgment, dkt. [62], is **granted.**

### I.  Background

Indiana prisoner Robert Peacher brings this 42 U.S.C. § 1983 civil rights action against four defendants: 1) Warden Deshaun Zatecky; 2) Deputy Warden Dennis Reagle; 3) Executive Assistant Aaron Smith; and 4) Mailroom Supervisor Yolanda Chambers. Cross-motions for summary judgment have been filed and are ripe for resolution.

In his amended complaint, Mr. Peacher alleges that the defendants have violated his First Amendment rights by prohibiting him from receiving an IT security book dealing with hacking that he purchased. Dkt. 26.

1

## II. Summary Judgment Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those that might affect the outcome of the suit under applicable substantive law." *Dawson v. Brown,* 803 F.3d 829, 833 (7th Cir. 2015) (internal quotation omitted). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). The Court views the facts in the light most favorable to the non-moving party and all reasonable inferences are drawn in the non-movant's favor. *Barbera v. Pearson Educ., Inc.,* 906 F.3d 621, 628 (7th Cir. 2018). The Court cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Johnson v. Advocate Health and Hosps. Corp.* 892 F.3d 887, 893 (7th Cir. 2018).

## III. Discussion

### A. Undisputed Facts

The following statement of facts was evaluated pursuant to the standards set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to the non-moving parties with respect to the motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).

At all times relevant to his amended complaint, Mr. Peacher was an offender incarcerated by the Indiana Department of Correction (IDOC) at the Pendleton Correctional Facility (Pendleton). At all relevant times, Deshaun Zatecky was the Warden of Pendleton, Dennis Reagle

was the Deputy Warden, Aaron Smith was an Administrative Assistant, and Yolanda Chambers was the Mailroom Supervisor.

### 1. Purchase and Confiscation of Book

On or around April 27, 2019, Mr. Peacher ordered a book titled *Advanced Persistent Threat Hacking – The Art and Science of Hacking Any Organization* (the Book) from Edward R. Hamilton Bookseller Company, a vendor approved by the IDOC to sell books and other printed materials to inmates. Dkt. 62-3; dkt. 62-4 at 1. On May 14, 2019, the Book arrived at Pendleton and was screened by Ms. Chambers. Dkt. 62-2 at ¶¶ 8-9.

The stated purpose of the Book (on the jacket) is to teach its reader to hack and take advantage of vulnerabilities in institutional IT systems. Dkt. 62-4 at 2. The Book "reveals the mindset, skills, and effective attack vectors needed to compromise any target of choice." *Id.* The book "discusses the strategic issues that make all organizations vulnerable" and provides the reader with a methodology "for systematically targeting and infiltrating an organization and its IT systems." *Id.* The author of the Book presents "[a] unique, five-phased tactical approach to APT hacking" and techniques the reader "can use immediately to execute very effective attacks." *Id.*

After screening the Book, Ms. Chambers determined that the Book posed a risk to institutional security because the information could aid Mr. Peacher in compromising the security of Pendleton's IT infrastructure. Dkt. 62-2 at ¶ 9; dkt. 38-1 at 3. On May 14, 2019, Ms. Chambers sent Mr. Peacher a notice informing him that the Book was confiscated by the facility. Dkt. 62-2 at ¶ 10; dkt. 62-3.

That same day, Mr. Peacher notified the facility that he intended to grieve the facility's decision to confiscate the Book and requested that the book be retained until his grievance was decided. Dkt. 62-5.

Mr. Peacher filed a grievance challenging the mailroom's determination that the Book posed a security risk. Dkt. 62-6 at 10. While his grievance was pending, Mr. Peacher spoke with defendants Reagle and Smith about the confiscation of the Book and attempted to convince them that it did not pose a risk to institutional security. Dkt. 38 at 6. Mr. Peacher's grievance was denied on May 30, 2019. Dkt. 62-6 at 9. He appealed the denial of his grievance to Warden Zatecky, and on June 10, 2019, Warden Zatecky denied Mr. Peacher's grievance appeal. *Id.* at 5. Mr. Peacher's appeal to the IDOC Central Office was also denied. *Id.* at 2. On August 14, 2019, the Book was forwarded to Administrative Assistant Michelle Rains. Dkt. 62-2 at ¶ 13.

On or about May 22, 2019, Mr. Peacher was allowed to keep a book, *Hacking for Dummies*, he purchased from Amazon.com (the Allowed Book). Mr. Peacher states that this book "specifically encompasses everything an individual needs to actually begin threat hacking[.]" Dkt. 38 at 2, ¶ 3; dkt. 38-1 at 4. The cover of the Allowed Book states it includes ways to "[p]revent Windows 10, Linux, and macOS attacks, [u]se the latest tools and techniques, [d]evelop a security testing plan[.]" Dkt. 62-9.

Mr. Peacher is not permitted access to the internet or the IDOC intranet. Dkt. 38 at 2, ¶ 5. Books on computer programming are available in the facility library for inmates to read. Dkt. 38-1 at 5-6. There is a program called The Last Mile in which the IDOC partners with an outside company to teach computer skills and coding to inmates. *Id.* at 8.  That program is not available at Pendleton. *Id.*

Since being incarcerated within IDOC, Mr. Peacher has been found guilty of unauthorized possession of a cell phone or other electronic devices at least five times. Dkt. 62-7. None of the rule violations were for hacking. *Id.*

### 2. IDOC Correspondence Policy

An offender's sending and receipt of mail, electronic or otherwise, is governed by IDOC Policy 02-01-103 (Correspondence Policy). Dkt. 62-8 at 1-2. Pursuant to the Correspondence Policy, all incoming mail is screened by mailroom staff and inspected to verify and record receipt of property and for removal of contraband or prohibited property, including property that poses a security risk to the facility. Dkt. 62-2, ¶ 4.

The Correspondence Policy defines "printed matter" as "[b]ooks, magazines, newspapers and other periodicals." Dkt. 62-8 at 3. The Correspondence Policy states that "[a]n offender may acquire or possess printed matter on any subject. However, printed matter shall be inspected and may be excluded if the matter is contraband or prohibited property." *Id.* at 20. "Printed matter which threatens the security of the public, facility, or program, . . . shall be considered prohibited property and shall be excluded…." *Id.* One example of prohibited property is that which is "[e]ncouraging or instructing in the commission of criminal activity[.]" *Id.* at 21.

### B. Analysis

The facts of this case are not complicated. Mr. Peacher ordered two books on hacking. One was confiscated, the other was not. The defendants base the prohibition on the Book on the determination that the Book posed a risk to institutional security. Whether or not the Allowed Book could also pose a security risk is not dispositive.

Prisoners have a First Amendment "freedom to read." *King v. Fed. Bureau of Prisons*, 415 F.3d 634, 638 (7th Cir. 2005). That right is not unlimited, however. "In *Turner* [*v. Safley,* 482 U.S. 78 (1987)], the Supreme Court determined that prison regulations that restrict inmates' constitutional rights are nevertheless valid if they are reasonably related to legitimate penological

interests." *Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010). Courts should consider four factors set forth by *Turner* when determining the reasonableness of restrictive prison regulations:

"(1) whether there is a rational relationship between the regulation and the legitimate government interest advanced;

(2) whether the inmates have alternative means of exercising the restricted right;

(3) whether and the extent to which accommodation of the asserted right will impact prison staff, inmates' liberty, and the allocation of limited prison resources; and

(4) whether the contested regulation is an "exaggerated response" to prison concerns and if there is a "ready alternative" that would accommodate inmates' rights."

*Id.* (citing *Turner*, 482 U.S. at 89-91).

"Inmates like [Peacher] who challenge the reasonableness of a prison regulation bear the burden of proving its invalidity." *Id.* "The burden is a weighty one: We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Id.* (internal quotation omitted). \

"The four factors are all important, but the first one can act as a threshold factor regardless which way it cuts." *Id.* If the logical connection between the stated goal and the regulation is too remote, the policy may be rendered arbitrary or irrational. *Id.* (internal citation omitted). If there is "'only minimal evidence suggesting that a prison's regulation is irrational, running through each factor at length is unnecessary.'" *Id.* (quoting *Mays v. Springborn,* 575 F.3d 643, 648 (7th Cir. 2009)).

Mr. Peacher argues that because the other book on the subject of hacking was allowed into the facility and similar books are in the facility library, the basis for the prohibition on the Book is

6

not truly related to a legitimate penological interest of institutional security. He also argues that because inmates can be taught how to perform computer coding, they are also being taught how to "hack." He contends that he does not have access to the internet, so the defendants' concerns are exaggerated. Finally, he suggests that inmates are allowed to use various dangerous tools such as welding torches and plasma that could be used to make deadly weapons, and therefore, the defendants' concerns about security are inconsistent and unfairly applied and therefore not reasonably related to a legitimate penological interest.

The parties dispute the similarities between the two books at issue. Mr. Peacher argues that the Allowed Book has a chapter on cracking the hacker mindset, hacking network infrastructure systems, hacking wireless networks, hacking mobile devices, hacking various operating, database, and systems. The defendants argue that the focus of the Allowed Book is maintaining the cybersecurity of one's business and "lets you in on the secrets of vulnerability and penetration testing, security best practices, and everything else you need to know to stop attackers before they cause problems for your business." Dkt. 62-9 at 2. They assert that the Book is solely focused on attacking institutional IT systems and teaches how to "[m]aster the tactics and tools of the advanced persistent threat hacker" and provides "a systematic approach [to hacking] designed to ensure success, avoid failures, and minimize the risk of being caught." Dkt. 62-4 at 2. They contend that these differences are sufficient to support a reasonable belief that the Book presents a significantly greater risk to institutional security than the Allowed Book.

The question for the Court is not whether the Book does, in fact, pose a greater risk to security than the Allowed Book. Rather, the Court must determine whether, while giving great deference to the defendants' professional judgment, the defendants are rational in their belief that the Book poses a risk to prison security and safety. Here, the Court cannot conclude that the

connection between the restriction on the Book and the goal of prison security is "so remote as to render the policy arbitrary or irrational." *Turner,* 482 U.S. at 89–90.

While Mr. Peacher has arguably built a case for restricting both books, he has not demonstrated that because one book was allowed, both books must be allowed. This argument has been rejected. *Mays*, 575 F.3d at 649 ("Mays's only argument that the prison's censorship was unreasonable is that he had access to other writings and to television shows about prison riots, but the deference we afford prisons permits such seeming inconsistencies."). The fact that Mr. Peacher is not permitted to have access to the internet does not change this outcome. Moreover, any comparison to other alleged risks to prison security such as inmates' use of welding torches or possibly building weapons is not relevant to the issue at hand. The fact that prison itself is a dangerous place and presents countless opportunities for mischief by those housed there does not render the restriction on the Book invalid.

Although Mr. Peacher disagrees, the defendants also reasonably argue that it is not inconceivable that inmates such as Mr. Peacher could unlawfully access the internet either through their prison-issued tablets, contraband telephones (which Mr. Peacher has possessed), or by distracting staff members away from their own computers.

Having determined that the restriction on the Book is logically and rationally connected to the legitimate penological interest of prison security, the Court need not plod through the remaining *Turner* factors. That said, the Court does further find that the second factor cuts against Mr. Peacher's claim as well. He has demonstrated that he has "alternative means of exercising the restricted right" by having access to the Allowed Book and other books in the law library.

The defendants contend that only defendant Chambers confiscated the Book and that the other defendants were not personally involved for purposes of section 1983 liability. While it is

8

true that "[i]ndividual liability under § 1983… requires personal involvement in the alleged constitutional deprivation," *Colbert v. City of Chi.,* 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted), the Court need not analyze whether the remaining defendants were sufficiently involved in the process of denying Mr. Peacher the Book. No matter who was involved, there was no First Amendment violation.

As a matter of law, the refusal to allow Mr. Peacher to have the Book did not violate his First Amendment rights.

## IV. Conclusion

For the reasons discussed above, the plaintiff's motion for summary judgment, dkt. [39], is **denied** and the defendants' cross- motion for summary judgment, dkt. [62], is **granted.** Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date:   7/29/2020

*(signature)*
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

R. PEACHER, 881627
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

All electronically registered counsel